## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT LOWINGER, Individually and On Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>    v.<br><br>CELGENE CORPORATION, MARK J. ALLES, RICHARD W. BARKER, MICHAEL W. BONNEY, MICHAEL D. CASEY, CARRIE S. COX, MICHAEL A. FRIEDMAN, JULIA A. HALLER, PATRICIA HEMMINGWAY HALL, JAMES J. LOUGHLIN, ERNEST MARIO, and JOHN H. WEILAND,<br><br>          Defendants. | Case No. _____<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Robert Lowinger ("Plaintiff") by and through his undersigned attorneys, brings this class action on behalf of himself and all others similarly situated, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Celgene Corporation ("Celgene" or the "Company") and other related parties and non-parties with the U. S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Celgene and other related non-parties; (c) review of news articles, shareholder communications, and postings on Celgene's website concerning the Company's public statements; and (d) review of other publicly available information concerning Celgene and Defendants.

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Celgene against the Company and the members of the Company's board of directors (the "Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of Celgene.

2.      On January 2, 2019, the Board caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Burgundy Merger Sub, Inc. ("Merger Sub"), a wholly-owned subsidiary of Bristol-Myers Squibb Company ("Bristol-Myers Squibb"). The transactions referred to in the Merger Agreement are referred to herein as the "Proposed Merger."

3.      Under the terms of the agreement, Celgene shareholders will receive: 1.0 Bristol-Myers Squibb share, $50.00 in cash, and one tradeable Contingent Value Right ("CVR")[1] for each share of Celgene, collectively sometimes referred to herein as the "Merger Consideration."

4.      The consummation of the Proposed Merger is subject to certain closing conditions, including the approval of the stockholders of Celgene. The Company expects the Proposed Merger to close in the third quarter of 2019.

5.      On February 1, 2019, in order to convince Celgene's shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a joint materially incomplete and misleading registration statement, which was filed by Bristol-Myers Squibb on Form S-4 with the SEC (the "S-4" or the "Registration Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

---

[1] Each CVR will entitle its holder to receive a payment for the achievement of future regulatory milestones.

6.     While Defendants are touting the fairness of the Merger Consideration to the Company's stockholders in the S-4, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the S-4 incomplete and misleading.

7.     It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights in an informed way. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.

8.     Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Celgene's stockholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

10.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) Celgene is headquartered in this District; (iii) each of the Individual Defendants, and Company officers and/or directors, either resides in this District or has extensive contacts within this District; (iv) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (v) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (vi) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.     Plaintiff is, and at all relevant times has been, a Celgene stockholder.

13.     Defendant Celgene Corporation is a Delaware corporation with its principal executive offices located at 86 Morris Avenue in Summit, New Jersey 07901. Shares of Celgene common stock are traded on the Nasdaq Global Select Market ("Nasdaq") under the symbol "CELG."

14.     Defendant Mark J. Alles ("Alles") was Chairman of the Board and Chief Executive Officer of the Company at all times relevant hereto.

15.     Defendant Richard W. Barker ("Barker") is and has been a director of the Company at all times relevant hereto.

16.     Defendant Hans Bishop ("Bishop") is and has been a director of the Company at all times relevant hereto.

17.     Defendant Michael W. Bonney ("Bonney") is and has been a director of the Company at all times relevant hereto.

18.     Defendant Michael D. Casey ("Casey") is and has been a director of the Company at all times relevant hereto.

19.     Defendant Carrie S. Cox ("Cox") is and has been a director of the Company at all times relevant hereto.

20.     Defendant Michael A. Friedman ("Friedman") is and has been a director of the Company at all times relevant hereto.

21.     Defendant Julia A. Haller ("Haller") is and has been a director of the Company at all times relevant hereto.

22.     Defendant Patricia Hemmingway Hall ("Hall") is and has been a director of the Company at all times relevant hereto.

23.     Defendant James J. Loughlin ("Loughlin") is and has been a director of the Company at all times relevant hereto.

24.     Defendant Ernest Mario ("Mario") is and has been a director of the Company at all times relevant hereto.

25.     Defendant John H. Weiland ("Weiland") is and has been a director of the Company at all times relevant hereto.

26.     Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland are collectively referred to herein as the "Individual Defendants" and, with Celgene, as "Defendants."

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and the other stockholders of Celgene (the "Class"). Excluded from the Class are Defendants herein and any person or other entity related to or affiliated with any Defendant.

28.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable. As of December 31, 2018, there were approximately 700,238,758 shares of Celgene common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Celgene will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the S-4 in violation of Section 14(a) of the Exchange Act ("Section 14(a)");

ii.      whether the Individual Defendants have violated Section 20(a) of the Exchange Act ("Section 20(a)"); and

iii.      whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading S-4.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members

of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.       Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.       A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29.       Celgene was incorporated in the State of Delaware in 1986. Celgene is an integrated global biopharmaceutical company engaged primarily in the discovery, development and commercialization of innovative therapies for the treatment of cancer and inflammatory diseases through next-generation solutions in protein homeostasis, immuno-oncology, epigenetics, immunology and neuro-inflammation. Its primary commercial stage products include REVLIMID®, POMALYST®/IMNOVID®, OTEZLA®, ABRAXANE®, and VIDAZA®.

### Background of the Proposed Merger

30.       According to the S-4, from time to time, the Board reviews potential opportunities to enhance stockholder value, including potential strategic acquisitions and divestitures, collaborations, investments and other strategic transactions and opportunities.

31.       In early 2017, members of Celgene management and members of Bristol-Myers Squibb management engaged in preliminary discussions regarding a possible stock for stock merger of equals, and the two companies entered into a mutual confidentiality agreement on April 4, 2017 to enable the sharing of limited, initial diligence materials. However, following

these exploratory conversations and prior to commencing full due diligence, in June 2017 the parties decided to end further consideration of the potential transaction.

32.     On September 11 and 12, 2018, the board of directors of Bristol-Myers Squibb (the "BMS Board") held a regularly scheduled meeting. The BMS Board discussed the potential of making an acquisition proposal to Celgene and the range of aggregate values of such a proposal. After discussion, the BMS Board determined that it was advisable to continue to explore a potential acquisition of Celgene and, in connection therewith, authorized and directed Giovanni Caforio ("Caforio"), Chairman and Chief Executive Officer of Bristol-Myers Squibb, to approach Alles to propose a potential transaction in which Bristol-Myers Squibb would acquire Celgene and Celgene stockholders would receive cash and Bristol-Myers Squibb common stock. The BMS Board granted Dr. Caforio the discretion to determine the specific aggregate value per share for purposes of the initial acquisition proposal, as well as the mix of cash and Bristol-Myers Squibb common stock comprising the aggregate value per share.

33.     On September 13, 2018, Caforio contacted Alles to request a meeting.

34.     On September 21, 2018, Alles met with Caforio for dinner, during which Caforio proposed and provided a written presentation outlining a potential transaction in which Bristol-Myers Squibb would acquire Celgene and Celgene stockholders would receive cash and Bristol-Myers Squibb common stock with an aggregate value of $110 per share. Caforio also indicated to Alles that the proposal was subject to review and completion of due diligence on Celgene and negotiation of mutually acceptable definitive agreements. Caforio did not convey to Alles during the meeting a specific proposed split between cash and stock, or the manner in which the stock consideration would be converted into an exchange ratio, but Caforio noted that Bristol-Myers

Squibb was contemplating that the stock portion of the consideration would provide Celgene stockholders with ownership in the combined company in the mid-30 percent range.

35.     On September 25, 2018, Alles met with the Executive Committee of the Board (the "Executive Committee") to discuss the proposal received. The Executive Committee agreed that the proposal would be discussed in more detail at the next regularly scheduled meeting of the Board on October 16 and 17, 2018.

36.     On October 1, 2018, Alles contacted Caforio to inform him that the Board would discuss the September 21 proposal at its upcoming meeting that month. The following day, after providing the BMS Board on October 1, 2018 with an update of his discussion with Alles, Caforio sent an e-mail to Alles reaffirming the proposal and requesting access to due diligence.

37.     On October 8, 2018, the Board held a special meeting, with members of Celgene management in attendance. Alles updated the Board regarding the proposal from Bristol-Myers Squibb, and told the Board that the proposal, as well as Celgene's long-range strategic plan, would be discussed in more detail the following week during the regularly scheduled meeting.

38.     On October 14, 2018, Caforio sent an e-mail to Alles in advance of the planned Board meeting reaffirming that, notwithstanding the recent volatility in the market prices of Celgene common stock and Bristol-Myers Squibb common stock, Bristol-Myers Squibb remained interested in pursuing a potential transaction on the terms previously proposed. The price of both Celgene common stock and of Bristol-Myers Squibb common stock had declined since September 21, 2018, with the closing price of Celgene common stock on October 12, 2018 being $82.58 per share, and the closing price of Bristol-Myers Squibb common stock on that day being $57.51 per share.

39. On October 16-17, 2018, the Board met and reviewed and discussed Celgene's long-range strategic plan and outlook presented by members of Celgene management and representatives of J.P. Morgan Securities LLC ("J.P. Morgan"), a financial advisor to Celgene, and Wachtell, Lipton, Rosen & Katz ("Wachtell Lipton"), Celgene's legal counsel. Members of Celgene management and representatives of J.P. Morgan provided an overview of the terms of the Bristol-Myers Squibb proposal, as well as preliminary analyses relating to valuation, including those based on the financial information prepared by members of Celgene management in connection with Celgene's long-range strategic plan. Members of Celgene management also noted certain near-term events that they expected would be positive developments for the company, including the announcement later that month of Celgene's earnings results for the third quarter of 2018 and Celgene's expected presentations for the Annual Meeting of the American Society of Hematology, which is referred to in this joint proxy statement/prospectus as ASH, in December 2018. The Board unanimously determined that, notwithstanding the potential strategic merit of a combination between Bristol-Myers Squibb and Celgene, the terms outlined did not at that time provide the Celgene stockholders with sufficient value and, therefore, did not provide for a basis to proceed to due diligence. The Board further agreed that the Executive Committee should monitor and instruct members of Celgene management on behalf of the Board regarding subsequent interactions with Bristol-Myers Squibb, and that the full Board would be convened as appropriate.

40. On October 18, 2018, Alles called Caforio to convey the Board's determination. Caforio asked if the Board had concerns regarding the strategic fit between the two companies, the potential mix of cash and stock, the structure of the proposed transaction, social issues or any other factor beyond value. Alles reported that Celgene's response substantially reflected the

Board's belief that the terms outlined did not provide sufficient value at that time to Celgene stockholders, but acknowledged the strategic merit and logic of a potential transaction between the companies.

41.     On October 31, 2018, at Caforio's request, Caforio and Alles met, during which the two discussed recent events for both companies and in the biopharmaceutical industry generally, including the recent decline in the stock prices of biopharmaceutical companies, including both Bristol-Myers Squibb and Celgene. Caforio and Alles discussed the impact of these events on a potential transaction between the companies, as well as certain upcoming events for Celgene. Caforio suggested that he would contact Alles regarding the potential transaction in early December 2018 following Celgene's presentation of clinical data at ASH.

42.     On November 15, 2018, Caforio called Alles and informed him that Bristol-Myers Squibb was preparing a revised proposal for the acquisition of Celgene, and that he hoped to be in a position to present this proposal to Alles on December 5, 2018, following the next regularly scheduled meeting of the BMS Board. During this conversation, Caforio requested the ability to conduct, prior to the upcoming BMS Board meeting on December 5, 2018, limited due diligence relating to certain Celgene intellectual property to help inform a revised proposal.

43.     On November 16, 2018, the Executive Committee met with Alles to discuss Bristol-Myers Squibb's request for limited due diligence relating to certain Celgene intellectual property and determined that it would be appropriate to allow Bristol-Myers Squibb to conduct this limited due diligence, but that Celgene also should request the ability to conduct limited reverse due diligence on certain Bristol-Myers Squibb intellectual property because these assets could affect the value of a potential transaction for Celgene's stockholders.

44.     On November 19, 2018, Alles called Caforio to convey the Executive Committee's determination and, on November 20, 2018, Caforio contacted Alles to inform Alles that Bristol-Myers Squibb was willing to proceed on that basis with mutual limited due diligence.

45.     On November 23, 2018, Celgene and Bristol-Myers Squibb entered into a mutual confidentiality agreement, which included mutual standstill provisions that would terminate with respect to either party if such party were to enter into a definitive agreement with a third party providing for a change-of-control transaction.

46.     During a meeting on November 28, 2018 and in subsequent teleconferences, members of management of each of Bristol-Myers Squibb and Celgene reviewed intellectual property matters with respect to the other company.

47.     On December 5, 2018, following the meeting of the BMS Board, Caforio sent a letter to Alles proposing a transaction in which Bristol-Myers Squibb would acquire Celgene for $55.00 in cash and 0.930 of a share of Bristol-Myers Squibb common stock, for each share of Celgene common stock. The letter indicated that the proposal was subject to completion of due diligence and negotiation of mutually acceptable definitive agreements. The letter also noted that the revised proposal represented an increase in aggregate value, as well as an increase in the cash component. The letter requested immediate progression to full due diligence, and indicated a strong desire to announce a transaction by January 2, 2019 given the significant risks to both companies. The letter also proposed that two current members of the Board would be added to the BMS Board upon the closing of the transaction. Assuming that each share of Bristol-Myers Squibb common stock had a value of $52.03, which was the closing price of Bristol-Myers

Squibb common stock on December 4, 2018 (the last trading day prior to the date of the letter), the proposal represented an aggregate value of $103.39 per share of Celgene common stock.

48.      On December 6, 2018, the Board held a meeting. Members of Celgene management provided an overview of the revised proposal from Bristol-Myers Squibb, including the request for immediate progression to full due diligence and desire to announce a transaction by January 2, 2019. During the discussion, members of Celgene management also noted certain market and industry developments that had occurred since the prior meeting of the Board, including the decline in the stock prices of both Bristol-Myers Squibb common stock and Celgene common stock, the general decline in the stock prices of biopharma peers and other macroeconomic dynamics faced by the industry generally. Members of Celgene management then presented certain financial analyses of the transaction terms proposed by Bristol-Myers Squibb, including those based on the financial information underlying Celgene's long-range strategic plan. Members of Celgene management also outlined certain financial aspects of the revised proposal, including as compared to Bristol-Myers Squibb's previous proposal, considerations related to the relative mix of cash and Bristol-Myers Squibb stock reflected in the proposal, the value of the proposal and premium represented by the proposal relative to current and historical Celgene and Bristol-Myers Squibb stock prices, and the potential value creation of the combined company.

49.      Members of Celgene management and the Board discussed that, for purposes of comparing the revised proposal to Bristol-Myers Squibb's original proposal, if each Bristol-Myers Squibb share had a value equal to the Bristol-Myers Squibb closing price on September 20, 2018 (the day before the original proposal), the revised proposal of $55.00 in cash and 0.930 of a share of Bristol-Myers Squibb common stock would represent an aggregate value of

$112.43 per share, as compared to the original proposal of $110.00. The Board unanimously determined that, although there may be strategic merit to a combination between Celgene and Bristol-Myers Squibb, the revised proposal was insufficiently attractive from the perspective of Celgene's stockholders and did not provide a basis for the companies to reach an agreement. The Board also instructed Alles to communicate the determination of the Board to Caforio and agreed that Alles could communicate with the Executive Committee regarding any subsequent discussions with Bristol-Myers Squibb.

50.     On December 8, 2018, Alles contacted Caforio to communicate that the Board determined the revised proposal continued to undervalue Celgene. Caforio and Alles then agreed to meet on December 10, 2018 to further discuss a potential transaction between the companies.

51.     On December 10, 2018, Caforio and Alles met and discussed terms of a potential transaction. During the course of these discussions, Caforio made a verbal proposal to acquire Celgene for an aggregate value of $108 per share, with the consideration to be composed of one share of Bristol-Myers Squibb common stock (up from the 0.930 exchange ratio previously proposed by Bristol-Myers Squibb) and $55 in cash. Caforio indicated to Alles that such proposal was subject to completion of due diligence of Celgene and negotiation of mutually acceptable definitive agreements. Alles conveyed to Caforio that, based on feedback at the prior Board meeting, he did not believe that the Board would accept the proposal, reminding Caforio that the Board had previously rejected a proposal in October with a headline value of $110 at that time and noting that reaching a definitive agreement by January 2, 2019 would be difficult. Caforio then made a further revised verbal proposal to Alles to acquire Celgene for one share of Bristol-Myers Squibb common stock and $57 in cash for each share of Celgene common stock. Caforio indicated that this proposal was subject to the approval of the BMS Board and, like the

other proposals discussed, completion of due diligence of Celgene and negotiation of mutually acceptable definitive agreements. Assuming that each share of Bristol-Myers Squibb common stock had a value of $53.08, which was the closing price of Bristol-Myers Squibb common stock on December 7, 2018 (the last trading day prior to the proposal), the proposal represented an aggregate value of $110.08 per Celgene share. Caforio also reiterated the importance of signing an agreement by January 2, 2019 and commencing full mutual due diligence. Alles conveyed that he would communicate the revised proposal to the Board.

52.     On December 10, 2018, Caforio sent Alles a letter confirming Bristol-Myers Squibb's revised proposal in which Celgene stockholders would receive one share of Bristol-Myers Squibb common stock and $57 in cash for each share of Celgene common stock.

53.     On December 10, 2018, the Executive Committee met to discuss the revised proposal and determined that the proposal warranted further consideration by the Board and authorized members of Celgene management to engage with their counterparts at Bristol-Myers Squibb on a mutual due diligence exercise.

54.     Over the next several days, members of management of the two companies made arrangements to begin a mutual due diligence process. On December 13, 2018, members of management of the two companies held mutual due diligence sessions in New York City, which were also attended by certain advisors of Bristol-Myers Squibb and Celgene. Bristol-Myers Squibb and Celgene each made available to the other, and each other's representatives, due diligence information regarding itself and its business, including via upload of documentation to a data room, which was opened on December 16, 2018. From December 13, 2018 until January 2, 2019, each company and its representatives continued their respective due diligence investigation of the other company and its business. The due diligence activities included data

room reviews, in-person meetings, conference calls and other interactions. Due diligence findings, including risks and upside opportunities, were reviewed by members of management of each of Bristol-Myers Squibb and Celgene with their respective boards of directors to help inform the strategic merits and financial analyses of the potential transaction.

55. On December 14, 2018, the Board held a special meeting to discuss the revised proposal from Bristol-Myers Squibb, with, inter alia, members of Celgene management and representatives of J.P. Morgan and Citigroup Global Markets Inc. ("Citigroup"), also a financial advisor to Celgene. Members of Celgene management provided an overview of the revised proposal, including Bristol-Myers Squibb's focus on announcing a transaction by January 2, 2019, and an update on full mutual due diligence. Members of Celgene management and the Board discussed, inter alia, how the revised proposal compared to the prior Bristol-Myers Squibb proposals. Following discussion, the Board determined that members of Celgene management should continue discussions with Bristol-Myers Squibb regarding a potential transaction. The Board also determined that outreach to multiple parties could present meaningful risks and, accordingly, concluded that the Executive Committee, with advice from members of Celgene management and Celgene's financial advisors, should determine whether to make any market outreach and, if so, to whom, taking into consideration these risks and the very limited number of parties that the directors believed had the scale and similar strategic focus to enable them to present a proposal that could be competitive with Bristol-Myers Squibb's revised proposal.

56. On December 14, 2018, Caforio and Alles spoke telephonically. Alles advised Caforio that members of Celgene management and its external advisors had been authorized by the Board to continue discussions on the basis of the revised proposal and that they were aligned with the goal of trying to reach a definitive agreement by January 2, 2019. Caforio

communicated to Alles that the current proposal, which would provide Celgene stockholders with one share of Bristol-Myers Squibb common stock and $57 in cash per Celgene share, represented Bristol-Myers Squibb's best and final offer. Later that day, on behalf of Bristol-Myers Squibb, Kirkland & Ellis provided an initial draft merger agreement to Wachtell Lipton, on behalf of Celgene.

57.     On December 16, 2018, the Executive Committee met to discuss potential outreach to other parties that could potentially be interested in a strategic transaction with Celgene. The Executive Committee determined that an inquiry should be made to Party A, a large publicly traded pharmaceutical company, which, in the view of the Executive Committee, was the only company that potentially would have a strategic fit with Celgene that was as strong as that between Celgene and Bristol-Myers Squibb.

58.     On December 17, 2018, at the direction of and on behalf of Celgene, a representative of J.P. Morgan contacted the chief executive officer of Party A, explained that Celgene was considering a change-of-control transaction and asked if Party A would be interested in presenting a proposal. On December 18, 2018, the chief executive officer of Party A contacted the representative of J.P. Morgan and indicated that Party A had determined not to make a proposal.

59.     Later that day, on December 18, 2018, Alles informed the Executive Committee of Party A's response. In light of the Executive Committee's view that no company was likely to have both a strategic fit with Celgene that was as strong as that between Celgene and Bristol-Myers Squibb, as well as the scale to match or exceed the consideration offered by Bristol-Myers Squibb, the Executive Committee determined that outreach to additional parties presented a

significant unfavorable risk of a leak that would be damaging to Celgene and the prospects of a transaction with Bristol-Myers Squibb, and therefore would not be advisable.

60.    On December 19, 2018, Wachtell Lipton, on behalf of Celgene, sent a revised draft of the merger agreement to Kirkland & Ellis, on behalf of Bristol-Myers Squibb. The revised draft provided, among other things, that each company's board of directors would be permitted to terminate the merger agreement in order to enter into a transaction providing for a superior proposal. It also reduced the termination fee that Celgene would be required to pay to Bristol-Myers Squibb if the merger agreement were terminated in specified circumstances from 3.75% of the equity transaction value to 2.0% of the equity transaction value. The draft merger agreement included a covenant requiring Bristol-Myers Squibb to divest assets or take similar actions if necessary to obtain regulatory approvals so long as doing so would not have a material adverse effect on the combined company after giving effect to the Celgene acquisition. Furthermore, the draft revised the "material adverse effect" definition applicable to Celgene to exclude any adverse development or events with respect to any of Celgene's existing or pipeline products. The revised draft agreement further provided that three (instead of two) of Celgene's directors would be added upon the closing of the transaction to the BMS Board.

61.    On December 21, 2018, the Board held a special meeting, with members of Celgene management and representatives of J.P. Morgan, Citigroup and Wachtell Lipton in attendance. The Board determined that in light of, among other things, the response from Party A, the limited universe of additional potential counterparties with similar strategic fit as Bristol-Myers Squibb or the size and strategic interest to complete a transaction on attractive terms, and the risk that additional outreach could cause a leak or otherwise jeopardize the potential transaction with Bristol-Myers Squibb, further outreach to other companies should not be made

at that time. The Board also determined that members of Celgene management should continue discussions with Bristol-Myers Squibb.

62.     On December 24, 2018, Kirkland & Ellis, on behalf of Bristol-Myers Squibb, sent a revised draft of the merger agreement to Wachtell Lipton. The revised draft reverted to Bristol-Myers Squibb's position on several of the open items, including providing that either company's board of directors would be permitted to change its recommendation to stockholders in favor of the transaction in response to a superior proposal but would not be able to unilaterally terminate the merger agreement in these circumstances; the "material adverse effect" provision would not exclude any adverse development or events with respect to Celgene's existing or pipeline products; and only two of the Celgene directors would join the board of directors of the combined company. In addition, the draft agreement provided that each party would be required to pay the other party a termination fee equal to 3.25% of the equity transaction value if the merger agreement were terminated in specified circumstances.

63.     On December 27, 2018, Wachtell Lipton, on behalf of Celgene, sent a revised draft of the merger agreement to Kirkland & Ellis, on behalf of Bristol-Myers Squibb. The revised draft provided, among other things, that each company's board of directors would be permitted to terminate the merger agreement in order to enter into a transaction providing for a superior proposal. It also provided that the termination fee that Celgene would be required to pay to Bristol-Myers Squibb if the merger agreement were terminated in specified circumstances would be equal to 2.5% of the equity transaction value, and the termination fee that Bristol-Myers Squibb would be required to pay to Celgene if the merger agreement were terminated in specified circumstances would be equal to 3.0% of the equity transaction value. Furthermore, the

õmaterial adverse effectö definition applicable to each party excluded any adverse regulatory or clinical development or events with respect to each partyøs pipeline products.

64. On December 27, 2018, Caforio and Alles met at the request of Caforio. Caforio explained that Bristol-Myers Squibb was no longer willing to agree to merger consideration consisting of $57 in cash and one share of Bristol-Myers Squibb common stock. Caforio further communicated that Bristol-Myers Squibb would be willing to proceed with a revised proposal consisting of $50 in cash and one share of Bristol-Myers Squibb common stock, subject to the completion of Celgene due diligence and finalization of mutually acceptable definitive agreements. Based on the closing price of Bristol-Myers Squibb common stock on December 27, 2018 of $50.41 (the closing price of Bristol-Myers Squibb common stock on that day), the proposal represented an aggregate value of $100.41 per Celgene share. Caforio also explained that Bristol-Myers Squibb was willing to include some form of CVR component to the merger consideration that would pay up to $8 in cash in the event that certain milestones were achieved following the closing. Alles explained that he would need to discuss the revised proposal with the Board.

65. On December 28, 2018, members of Celgene and Bristol-Myers Squibb management discussed and negotiated the terms of a possible CVR, including the amount that could be payable under the CVR and the milestones that needed to be achieved prior to the making of such payments. Members of Celgene management proposed to members of Bristol-Myers Squibb management that the CVR could pay up to $10, with $2 payable upon FDA approval of each of Celgeneøs five near-term, late-stage pipeline assets.

66. On December 28, 2018, the Board held a special meeting with members of Celgene management and representatives of J.P. Morgan, Citigroup and Wachtell Lipton in

attendance. Members of Celgene management presented and reviewed Bristol-Myers Squibb's revised proposal and updated the Board on the status of negotiations between the companies regarding the CVR. After discussion, the Board determined that members of Celgene management should continue to engage with Bristol-Myers Squibb but noted that the terms of the CVR should be clear, tied to near-term events, and aligned with the strategy of the combined company.

67.     On December 29, 2018, the companies continued to negotiate the terms of the CVR. During those negotiations, Bristol-Myers Squibb stated that it was not willing to pay any amount under the CVR unless multiple milestones were achieved before the specified milestone dates. In addition, Bristol-Myers Squibb stated that it would only agree for the CVR to pay up to $9, not $10 as requested by Celgene. Finally, under Bristol-Myers Squibb's proposal, the CVR would pay $9 only if the FDA approves on or before December 31, 2020 the commercial manufacturing, marketing and sale of all of Ozanimod, JCAR017 and bb2121 with certain additional requirements related to the regulatory approvals.

68.     On December 30, 2018, Caforio sent a letter to Alles confirming a proposal discussed on December 29, 2018. The letter stated that Bristol-Myers Squibb's best and final offer was a price per Celgene common share of $50 in cash and one share of Bristol-Myers Squibb common stock. In addition, each share of Celgene common stock would receive one CVR that would pay $9 if the FDA were to approve on or before December 31, 2020 the commercial manufacturing, marketing and sale of all of Ozanimod, JCAR017 and bb2121 with certain additional requirements related to the regulatory approvals. The letter also stated that Bristol-Myers Squibb would be willing to increase the cash component of the consideration to up to $57 per share, with a corresponding reduction in the exchange ratio to maintain overall value.

Furthermore, Bristol-Myers indicated that it would announce an intention to execute a post-closing share buy-back of approximately $5 billion, which it believed would provide support for the trading price of the Bristol-Myers Squibb common stock received by the Celgene stockholders and allow for additional value-creation upside for the stockholders of the combined company. The letter indicated that the proposal was subject to the completion of limited remaining due diligence and finalization of mutually acceptable definitive agreements, and would expire if a definitive agreement were not signed by 5:00 p.m. on January 5, 2019.

69.     From December 31, 2018 to January 2, 2019, Celgene, Bristol-Myers Squibb and their respective advisors continued to discuss and negotiate the open issues in the merger agreement and the CVR agreement. Following these discussions and negotiations, the companies agreed that the merger agreement would provide that each company's board of directors would be permitted to terminate the merger agreement in order to enter into a transaction providing for a superior proposal. They also agreed that the termination fee that each party would be required to pay to the other party if the merger agreement were terminated in specified circumstances would be equal to $2.2 billion, which was approximately 2.95% of the equity transaction value (excluding the CVR) and approximately 2.71% of the equity transaction value (including the full nominal value of the CVR), based on the closing price of Bristol-Myers Squibb common stock as of the date prior to announcement of the merger agreement. Furthermore, the companies agreed that the "material adverse effect" definition applicable to each party would exclude any adverse development or events with respect to either party's pipeline products. With respect to the CVR, the companies also agreed to extend to March 31, 2021 the specified milestone date for the required FDA approval for bb2121 and to eliminate any additional requirements related to the regulatory approvals for Ozanimod, JCAR017 and bb2121.

70.     On January 2, 2019, the Board held a special meeting, with members of Celgene management and representatives of J.P. Morgan, Citigroup and Wachtell Lipton in attendance. The Board, following discussion, determined that it would prefer to keep the mix of consideration of $50 per share in cash and one share of Bristol-Myers Squibb common stock, in light of its view that the stock ownership in the combined company would allow Celgene stockholders to participate in the anticipated earnings and growth of a stronger combined company, as well as any synergies resulting from the merger. Representatives of J.P. Morgan and Citigroup reviewed with the Board their respective financial analyses relating to the fairness to the holders of Celgene common stock of the consideration proposed to be paid in the merger, and J.P. Morgan and Citigroup each then rendered its oral opinion, which was subsequently confirmed in writing, to the Board to the effect that, as of January 2, 2019 and based on and subject to the assumptions made, procedures followed, matters considered and other limitations and qualifications set forth in each respective written opinion, the merger consideration to be paid to the holders of Celgene common stock in the merger was fair, from a financial point of view, to such holders. Following discussion, the Board unanimously determined that the merger was fair to, and in the best interests of, Celgene and its stockholders, approved and declared advisable the merger agreement, the merger and the other transactions contemplated by the merger agreement, and resolved to recommend adoption of the merger agreement to holders of shares of Celgene's common stock.

71.     Following the approval of the merger agreement and the merger by each of the BMS Board and the Board, Bristol-Myers Squibb and Celgene executed the merger agreement early during the morning of January 3, 2019. Concurrently with entering into the merger

agreement, Bristol-Myers Squibb entered into a bridge facility commitment letter with MSSF and MUFG.

**The Company Announces the Proposed Merger**

72.    On the morning of January 3, 2019, prior to the open of markets, Bristol-Myers Squibb and Celgene publicly announced the transaction via press release. The press release stated, in pertinent part:

> **Bristol-Myers Squibb to Acquire Celgene to Create a Premier Innovative Biopharma Company**
>
> Highly Complementary Portfolios with Leading Franchises in Oncology, Immunology and Inflammation and Cardiovascular Disease
>
> Significantly Expands Phase III Assets with Six Expected Near-Term Product Launches, Representing Greater Than $15 Billion in Revenue Potential
>
> Registrational Trial Opportunities and Early-Stage Pipeline Position Combined Company for Sustained Leadership Underpinned by Cutting-Edge Technologies and Discovery Platforms
>
> Strong Combined Cash Flows, Enhanced Margins and EPS Accretion of Greater Than 40% in First Full Year
>
> Approximately $2.5 Billion of Expected Run-Rate Cost Synergies to Be Achieved by 2022
>
> NEW YORK & SUMMIT, N.J.,--(BUSINESS WIRE)--Bristol-Myers Squibb Company (NYSE:BMY) and Celgene Corporation (NASDAQ:CELG) today announced that they have entered into a definitive merger agreement under which Bristol-Myers Squibb will acquire Celgene in a cash and stock transaction with an equity value of approximately $74 billion. Under the terms of the agreement, Celgene shareholders will receive 1.0 Bristol-Myers Squibb share and $50.00 in cash for each share of Celgene. Celgene shareholders will also receive one tradeable Contingent Value Right (CVR) for each share of Celgene, which will entitle the holder to receive a payment for the achievement of future regulatory milestones. The Boards of Directors of both companies have approved the combination.

The transaction will create a leading focused specialty biopharma company well positioned to address the needs of patients with cancer, inflammatory and immunologic disease and cardiovascular disease through high-value innovative medicines and leading scientific capabilities. With complementary areas of focus, the combined company will operate with global reach and scale, maintaining the speed and agility that is core to each company's strategic approach.

Based on the closing price of Bristol-Myers Squibb stock of $52.43 on January 2, 2019, the cash and stock consideration to be received by Celgene shareholders at closing is valued at $102.43 per Celgene share and one CVR (as described below). When completed, Bristol-Myers Squibb shareholders are expected to own approximately 69 percent of the company, and Celgene shareholders are expected to own approximately 31 percent.

"Together with Celgene, we are creating an innovative biopharma leader, with leading franchises and a deep and broad pipeline that will drive sustainable growth and deliver new options for patients across a range of serious diseases," said Giovanni Caforio, M.D., Chairman and Chief Executive Officer of Bristol-Myers Squibb. "As a combined entity, we will enhance our leadership positions across our portfolio, including in cancer and immunology and inflammation. We will also benefit from an expanded early- and late-stage pipeline that includes six expected near-term product launches. Together, our pipeline holds significant promise for patients, allowing us to accelerate new options through a broader range of cutting-edge technologies and discovery platforms."

Dr. Caforio continued, "We are impressed by what Celgene has accomplished for patients, and we look forward to welcoming Celgene employees to Bristol-Myers Squibb. Our new company will continue the strong patient focus that is core to both companies' missions, creating a shared organization with a goal of discovering, developing and delivering innovative medicines for patients with serious diseases. We are confident we will drive value for shareholders and create opportunities for employees."

"For more than 30 years, Celgene's commitment to leading innovation has allowed us to deliver life-changing treatments to patients in areas of high unmet need. Combining with Bristol-Myers Squibb, we are delivering immediate and substantial value to Celgene shareholders and providing them meaningful participation in the long-term growth opportunities created by the combined company," said Mark Alles, Chairman and Chief Executive Officer of Celgene. "Our employees should be

incredibly proud of what we have accomplished together and excited for the opportunities ahead of us as we join with Bristol-Myers Squibb, where we can further advance our mission for patients. We look forward to working with the Bristol-Myers Squibb team as we bring our two companies together.ö

**Compelling Strategic Benefits**

> **Leading franchises with complementary product portfolios provide enhanced scale and balance.** The combination creates:

> > Leading oncology franchises in both solid tumors and hematologic malignancies led by Opdivo and Yervoy as well as Revlimid and Pomalyst;

> > A top five immunology and inflammation franchise led by Orencia and Otezla; and

> > The #1 cardiovascular franchise led by Eliquis.

> > The combined company will have nine products with more than $1 billion in annual sales and significant potential for growth in the core disease areas of oncology, immunology and inflammation and cardiovascular disease.

The combined company will have nine products with more than $1 billion in annual sales and significant potential for growth in the core disease areas of oncology, immunology and inflammation and cardiovascular disease.

> **Near-term launch opportunities representing greater than $15 billion in revenue potential. The combined company will have six expected near-term product launches:**

> > Two in immunology and inflammation, TYK2 and ozanimod; and

> > Four in hematology, luspatercept, liso-cel (JCAR017), bb2121 and fedratinib.

These launches leverage the combined commercial capabilities of the two companies and will broaden and enhance Bristol-Myers Squibbös market position with innovative and differentiated products. This is in addition to a significant number of lifecycle management registrational readouts expected in Immuno-Oncology (IO).

* * *

Based on the closing price of Bristol-Myers Squibb stock on January 2, 2019, the cash and stock consideration to be received by Celgene shareholders is valued at $102.43 per share. The cash and stock consideration represents an approximately 51 percent premium to Celgene shareholders based on the 30-day volume weighted average closing stock price of Celgene prior to signing and an approximately 54 percent premium to Celgene shareholders based on the closing stock price of Celgene on January 2, 2019. Each share also will receive one tradeable CVR, which will entitle its holder to receive a one-time potential payment of $9.00 in cash upon FDA approval of all three of ozanimod (by December 31, 2020), liso-cel (JCAR017) (by December 31, 2020) and bb2121 (by March 31, 2021), in each case for a specified indication.

The transaction is not subject to a financing condition. The cash portion will be funded through a combination of cash on hand and debt financing. Bristol-Myers Squibb has obtained fully committed debt financing from Morgan Stanley Senior Funding, Inc. and MUFG Bank, Ltd. Following the close of the transaction, Bristol-Myers Squibb expects that substantially all of the debt of the combined company will be pari passu.

**Corporate Governance**

Following the close of the transaction, Dr. Caforio will continue to serve as Chairman of the Board and Chief Executive Officer of the company. Two members from Celgene's Board will be added to the Board of Directors of Bristol-Myers Squibb. The combined company will continue to have a strong presence throughout New Jersey.

**Approvals and Timing to Close**

The transaction is subject to approval by Bristol-Myers Squibb and Celgene shareholders and the satisfaction of customary closing conditions and regulatory approvals. Bristol-Myers Squibb and Celgene expect to complete the transaction in the third quarter of 2019.

**Advisors**

Morgan Stanley & Co. LLC is serving as lead financial advisor to Bristol-Myers Squibb, and Evercore and Dyal Co. LLC are serving as financial advisors to Bristol-Myers Squibb. Kirkland & Ellis LLP is serving as Bristol-Myers Squibb's legal counsel. J.P.

Morgan Securities LLC is serving as lead financial advisor and Citi is acting as financial advisor to Celgene. Wachtell, Lipton, Rosen & Katz is serving as legal counsel to Celgene.

\* \* \*

**Important Information For Investors And Stockholders**

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities or a solicitation of any vote or approval. It does not constitute a prospectus or prospectus equivalent document. No offering of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the U.S. Securities Act of 1933, as amended.

In connection with the proposed transaction between Bristol-Myers Squibb Company ("Bristol-Myers Squibb") and Celgene Corporation ("Celgene"), Bristol-Myers Squibb and Celgene will file relevant materials with the Securities and Exchange Commission (the "SEC"), including a Bristol-Myers Squibb registration statement on Form S-4 that will include a joint proxy statement of Bristol-Myers Squibb and Celgene that also constitutes a prospectus of Bristol-Myers Squibb, and a definitive joint proxy statement/prospectus will be mailed to stockholders of Bristol-Myers Squibb and Celgene. INVESTORS AND SECURITY HOLDERS OF BRISTOL-MYERS SQUIBB AND CELGENE ARE URGED TO READ THE JOINT PROXY STATEMENT/PROSPECTUS AND OTHER DOCUMENTS THAT WILL BE FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. Investors and security holders will be able to obtain free copies of the registration statement and the joint proxy statement/prospectus (when available) and other documents filed with the SEC by Bristol-Myers Squibb or Celgene through the website maintained by the SEC at https://www.sec.gov/. Copies of the documents filed with the SEC by Bristol-Myers Squibb will be available free of charge on Bristol-Myers Squibb's internet website at https://www.bms.com/ under the tab, "Investors" and under the heading "Financial Reporting" and subheading "SEC Filings" or by contacting Bristol-Myers Squibb's Investor Relations Department through https://www.bms.com/investors/investor-contacts.html. Copies of the documents filed with the SEC by Celgene will be available free of charge on Celgene's internet website at https://www.celgene.com/ under the tab "Investors" and under the heading "Financial Information" and subheading "SEC

Filingsö or by contacting Celgeneøs Investor Relations Department
at ir@celgene.com.

**The Preclusive Deal Provisions**

73.     In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Celgene.

74.     Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish Bristol-Myers Squibb with the terms of any competing bid and confidentiality agreement; (iii) a matching rights provision which gives Bristol-Myers Squibb four business days to match any unsolicited superior acquisition proposal the Board receives; and (iv) a provision that requires the Company to pay Bristol-Myers Squibb a termination fee of $2.2 billion if the Company, among other things, signs an alternative acquisition agreement.

75.     These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Boardøs ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Celgene.

76.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Celgeneøs shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

**Interests of the Officers and Directors of Celgene
to Completing the Proposed Merger**

77.     Certain of the officers and/or directors of the Company have significant financial interests in completing the Proposed Merger.

78.     Among other things, each of Celgene's executive officer is eligible to participate in Celgene's Executive Severance Plan (the "ESP"), and is eligible to receive the following severance benefits upon a CIC Termination, subject to the executive officer's execution and non-revocation of a release and termination agreement: (i) a cash severance payment equal to (x) 2.5 (or 3, in the case of the Chief Executive Officer) multiplied by (y) the sum of the executive officer's annual base salary and target annual cash incentive opportunity, (ii) COBRA continuation coverage at active employee rates for a benefits continuation period of up to 30 months (or 36 months, in the case of the Chief Executive Officer), (iii) 18 months of outplacement services, (iv) a prorated annual incentive compensation award for the year of termination based on the greater of assumed achievement of the applicable performance goals at the target level and the actual level of achievement of the applicable performance goals through the termination date, and (v) full accelerated vesting of all outstanding equity awards granted under Celgene's equity plans.

79.     The following, taken from the S-4, shows the potential payouts to Celgene's officers and directors as a result of their exchange of shares of Celgene for the Merger Consideration:

| Named Executive Officer[1] | Cash ($)[2] | Equity ($)[3] | Perquisites / Benefits ($)[4] | Tax Reimbursement ($) | Total ($) |
|---|---|---|---|---|---|
| Mark J. Alles | 10,411,397 | 17,321,068 | 159,200 | 0 | 27,891,665 |
| David V. Elkins | 3,992,613 | 8,044,450 | 137,600 | 2,938,139 | 15,112,802 |
| Peter N. Kellogg | 4,440,323 | 7,340,651 | 137,600 | 0 | 11,918,574 |
| S.J. Rupert Vessey | 3,909,714 | 5,441,003 | 137,600 | 2,706,719 | 12,195,036 |

**Interests of the Financial Advisors to the Proposed Merger**

80.    Celgene engaged J.P. Morgan and Citigroup (the "Celgene Financial Advisors") to act as its financial advisor in connection with the Proposed Merger, including the delivery of a fairness opinion as described above. Celgene agreed to pay J.P Morgan a transaction fee of $100 million, of which $15 million is payable by Celgene to J.P. Morgan in connection with J.P. Morgan's delivery of its opinion, and the balance of which becomes payable upon the closing of the merger. Celgene also agreed to pay Citigroup, for its financial advisory services in connection with the merger, an aggregate fee of $67 million, $10 million of which became payable upon the delivery by Citigroup of its opinion and the balance of which is payable upon completion of the merger. Celgene also agreed to reimburse the Celgene Financial Advisors for certain expenses and to indemnify the Celgene Financial Advisors and related persons against various liabilities.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND/OR MATERIAL OMISSIONS IN THE REGISTRATION STATEMENT

81.    Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material false and misleading statements or material misrepresentations or omissions. However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

**Material Omissions Relating to Celgene's Financial and Business Projections**

82.    The S-4 discloses Celgene's projections of certain non-GAAP (generally accepted accounting principles) financial measures, including EBITDA and Adjusted EBITDA, but Defendants failed to provide stockholders with the necessary line item projections for the metrics

used to calculate Celgene's non-GAAP metrics or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

83.    The S-4 also discloses Celgene Adjusted Bristol-Myers Squibb Financial Projections, which include EBITDA and Unlevered free cash flow. Defendants failed to provide stockholders with the necessary line item projections for the metrics used to calculate Bristol-Myers Squibb's non-GAAP metrics or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures.

84.    To avoid misleading stockholders with non-GAAP financial measures in business combinations such as the Proposed Merger, publicly traded companies must provide a reconciliation of the differences between the non-GAAP financial measures with the most comparable financial measures calculated and presented in accordance with GAAP measurements. Indeed, defendants acknowledge in the S-4, with respect to Celgene[2] and Bristol-Myers Squibb,[3] that non-GAAP financial measures as presented by Celgene may not be comparable to similarly titled measures reported by other companies. As such, Celgene's stockholders are entitled to the line item projections used to calculate the Company's, and

---

[2] "EBITDA, adjusted EBITDA and unlevered free cash flow are non-GAAP financial measures. This information was not prepared for public disclosure. Non-GAAP financial measures should not be considered a substitute for, or superior to, financial measures determined or calculated in accordance with GAAP. Additionally, non-GAAP financial measures as presented by Celgene may not be comparable to similarly titled measures reported by other companies. In the view of Celgene's management, the Celgene financial projections were prepared on a reasonable basis based on the information available to Celgene's management at the time of their preparation."

[3] "Bristol-Myers Squibb unlevered free cash flow and Bristol-Myers Squibb cash net income are non-GAAP financial measures. This information was not prepared for public disclosure. Non-GAAP financial measures should not be considered a substitute for, or superior to, financial measures determined or calculated in accordance with GAAP. Additionally, non-GAAP financial measures as presented by Bristol-Myers Squibb may not be comparable to similarly titled measures reported by other companies. In the view of Bristol-Myers Squibb's management, the Bristol-Myers Squibb financial projections were prepared on a reasonable basis based on the information available to Bristol-Myers Squibb's management at the time of their preparation."

Bristol-Myers Squibb's, non-GAAP projections or a reconciliation of the non-GAAP projections to the most comparable GAAP measures.

85.     The S-4 discloses that "Bristol-Myers Squibb management provided an estimate of the probability of achieving the three FDA approvals required to trigger the $9 payment under the CVR agreement … was 45%." The S-4 also discloses that "Celgene management provided estimates of the probabilities of achieving the three FDA approvals required to trigger the $9 payment under the CVR agreement to the Celgene Board in connection with its evaluation of the merger.… The probability of triggering the $9 payment under the CVR by March 31, 2021 was 54.4% for Celgene management case 1; 72.9% for Celgene management case 2; 100.0% for Celgene management case 3; and 69.1% for the Celgene blended management case, and the probability of triggering the payment under the CVR earlier, by December 31, 2020, was 45.9% for Celgene management case 1; 72.9% for Celgene management case 2; 100.0% for Celgene management case 3; and 66.2% for the Celgene blended management case." In short, the S-4s disclosures make it difficult for shareholders to value the CVR because it simply provides descriptions of management cases, without describing what those cases mean.

86.     The Proxy Statement also fails to disclose significant information for shareholders to estimate of contingent value payments pursuant to the CVR Agreement, which provides a one-time, $9-per-share bonus if Celgene's ozanimod, liso-cel, and bb2121 secure FDA approval. Among other things, the CVR does not disclose the likelihood of, for example, one or two of the foregoing treatments securing FDA approval, which would allow Celgene's shareholders to fairly appraise how to vote on the Proposed Merger.

**Material Omissions Relating to Celgene Financial Advisors Analyses and Fairness Opinions**

87.     With regard to J.P. Morgan's *Selected Public Trading Multiples Analyses* and Citigroup's *Selected Public Companies Analysis* for both Celgene and Bristol-Myers Squib, the S-4 fails to disclose 2019 P/E multiples and Price / FY2019E Earnings, respectively, based upon, *inter alia*, the Celgene blended management case and Celgene adjusted Bristol-Myers Squibb financial projections and analyst research reports (without explaining how the amount was derived, or from which analyst reports), and does not disclose the EPS estimates necessary to convert the 2019 P/E multiple to a share price.

88.     With regard to J.P. Morgan's *Selected Transaction Multiples Analysis* of Celgene and Citigroup's *Selected Precedent Transaction Analysis*, the S-4 fails to the S-4 fails to disclose the reasons or criteria used for each of the selected transactions. This is particularly important where, as here, there is substantial but incomplete overlap in the selection of transactions. Indeed, J.P. Morgan selected all seven of the transactions used by Citigroup, but also included the acquisition of Actelion Ltd by Johnson & Johnson in its analysis. The appropriateness of including that acquisition is particularly important to Celgene's shareholders, as that was the transaction consummated on the largest Forward EBITDA (CY1) of all acquisitions considered by either of the Celgene Financial Advisors.

89.     With respect to J.P. Morgan's and Citigroup's Discounted Cash Flow Analyses, the S-4 fails to disclose the specific numerical inputs and assumptions underlying the discount rates selected and applied in J.P. Morgan's analysis. This data is particularly important where, as here, each of the Celgene Financial Advisors came to different conclusions about the applicable discount rate using the same assumptions provided by Celgene's management (discount rates from 8.50% to 9.50% for Celgene and from 7.25% to 8.25% for Bristol-Myers Squibb use by

J.P. Morgan, compared with discount rates from 8.3% to 9.5% for Celgene and from 7.9% to 9.2% for Bristol-Myers Squibb used by Citigroup, and discount rates from 7.5% to 9% for Celgene and 7.5% to 8.5% for Bristol-Myers Squibb used by the Bristol-Myers Squibb financial advisors).

90.     With respect to the Celgene Financial Advisorsø Analyst Price Target Analyses, the S-4 fails to disclose which public equity research analysts were reviewed and each of their specific price targets. This is particularly important where, as here, J.P. Morgan disclosed that it õreviewed certain publicly available equity research analyst price targets for Bristol-Myers Squibb common stock available as of December 31, 2018, and noted that the range of such price targets was $47.00 per share to $70.00 per shareö while Citigroup õnoted that the range of such price targets as of December 31, 2018 was $47.00 to $75.00 per share of Bristol-Myers Squibb common stock.ö

## COUNT I

### (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT AND RULE 14A-9 PROMULGATED THEREUNDER)

91.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

92.     Section 14(a)(1) makes it õunlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.ö 15 U.S.C. § 78n(a)(1).

93.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

94.     Defendants have issued the S-4 with the intention of soliciting stockholders support for the Proposed Merger. Each Defendant reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, among other things, the financial projections for the Company and the fairness opinion of Celgene's financial advisor.

95.     In so doing, Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading. Each Defendant, by virtue of their roles as officers and/or directors, was aware of the omitted information but failed to disclose such information, in violation of Section 14(a). Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

96.     Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

97.     Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above

to be materially incomplete and misleading. Indeed, Defendants were required to be particularly attentive to the procedures followed in preparing the S-4 and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

98.     Defendants were, at the very least, negligent in preparing and reviewing the S-4. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

99.     The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

100.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT)

101.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

102.     The Individual Defendants acted as controlling persons of Celgene within the meaning of Section 20(a) as alleged herein. By virtue of their positions as officers and/or directors of Celgene, and participation in and/or awareness of the Company's operations and/or

intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

103.    Each of the Individual Defendants was provided with, or had unlimited access to, copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. They were thus directly involved in preparing this document.

105.    In addition, as set forth in the S-4 sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

106.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a).

107.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their as alleged herein. By virtue of their positions as controlling persons, these Defendants are

liable pursuant to Section 20(a). As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

108.    Plaintiff and the other members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C. Directing Defendants to account to Plaintiff and the other members of the Class for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: February 5, 2019                                  Respectfully Submitted,

                                                         By: /s/ *Gary S. Graifman*

                                                         Gary S. Graifman
                                                         **KANTROWITZ, GOLDHAMER**
                                                         **  & GRAIFMAN, P.C.**
                                                         210 Summit Avenue
                                                         Montvale, NJ 07645
                                                         Telephone:      (201) 391-7000
                                                         Facsimile:      (201) 307-1088
                                                         Email:          ggraifman@kgglaw.com

                                                         Aaron Brody
                                                         Michael J. Klein
                                                         **STULL, STULL, & BRODY**
                                                         6 East 45th Street
                                                         New York, NY 10017
                                                         Telephone:      (212) 687-7230
                                                         Facsimile:      (212) 490-2022
                                                         Email:          abrody@ssbny.com
                                                                         mklein@ssbny.com

                                                         *Attorneys for Plaintiff*